A. FRED SANGUINETTI, APPELLANT, *v.* HERMAN F. STRECKER AND F. JEAN STRECKER, HUSBAND AND WIFE, RESPONDENTS.

No. 9125

April 18, 1978                                       577 P.2d 404

---

[Rehearing denied May 23, 1978]

*Petersen & Petersen* and *Anthony J. Chargin,* Reno, for Appellant.

*Hill, Cassas & deLipkau* and *Thomas P. Erwin,* Reno, for Respondents.

## OPINION

By the Court, MOWBRAY, J:

The respondents, Herman F. and F. Jean Strecker, commenced this action against appellant, A. Fred Sanguinetti, seeking cancellation of certain deeds in the name of Sanguinetti to property they owned, known as Logan Shoals Harbor, on Lake Tahoe. The complaint was predicated on an allegation of fraud and was later amended to include a prayer for compensatory and punitive damages. Sanguinetti counterclaimed, asking

for specific performance of an alleged oral contract between the parties or, in the alternative, damages, reasonable compensation for services rendered, and return of his personal property. The case was tried to a jury. The jury found for the Streckers on their claim for damages and against Sanguinetti on his counterclaim, and awarded the Streckers $15,000 compensatory damages plus $25,000 punitive damages. The court entered judgment against Sanguinetti for these amounts and canceled the deeds in question. No relief was granted Sanguinetti, who has now appealed, asserting numerous assignments of error, which we reject as meritless.

1. *The Facts.*

The property that is the subject of this action contains approximately 11 acres, located at South Lake Tahoe. the property is improved with a restaurant, a marina, a family dwelling, and garages, together with outbuildings. The marina and restaurant are located on the portion of the property abutting the lake, commonly known as Logan Shoals Harbor, which was purchased by the Streckers in 1958. In 1964 the Streckers purchased the remaining portion of the property at issue, where they lived until shortly before the hearing on this action commenced in March 1976.

In 1969 the Streckers borrowed $50,000 from South Lake Tahoe Savings and Loan Association to replace and improve the existing breakwater at their marina. The loan, which was secured by a deed of trust on the Logan Shoals portion of the property, was to receive interest payments only until its maturity date, at which time the entire principal would become due. The Streckers failed to meet the first maturity date and received an extension of the loan to March 1, 1972.

In late 1971, Sanguinetti, Mrs. Strecker's nephew, first became involved with the property. He was then employed as vice president of Farmers and Merchants Bank of Linden, California, and had frequently been of assistance in obtaining loans for the Streckers in the past. The Streckers sought Sanguinetti's advice about the 1969 loan and about an offer to purchase a three-quarter interest in the property. Sanguinetti advised against sale of the property and offered his own services in its development. In addition, he promised to take care of the note to South Lake Tahoe Savings and Loan.

The subject of the instant litigation is a series of deeds whereby Sanguinetti purportedly acquired legal title to the entire property in question. The first deed is from the Streckers to First Stockton Title Company, dated March 3, 1972, and recorded March 22, 1972. The second deed, dated April 25, 1972, and recorded May 5, 1972, is from First Stockton Title

Company to Sanguinetti. A holding agreement, purportedly signed by the Streckers, was also introduced.[1]

The Streckers claimed to have signed only a document represented to them as a deed of trust on the Logan Shoals property in the amount of approximately $50,000. The original deed could not be found; the certified copy used at the trial contained a "floating" or blank signature page that was stapled to the uninitialed descriptive and operative portions of the deed.

Sanguinetti claimed that the deed and holding agreement had been signed by the Streckers pursuant to an oral agreement, whereby he was to develop the property, securing permits for and directing construction of extensive harbor improvements and a condominium development, with profits to be shared equally. He claimed that the Streckers were fully informed of and consented to the transfer of title to the title company and then to him. He claimed that Mr. Strecker had urged him for some time to take title to the property, and that he finally agreed to do so. He testified that he had at this point personal obligations in connection with the development, including a $55,000 note secured by his personal assets that he intended to use to pay off the South Lake Tahoe Savings and Loan encumbrance, as well as contractual commitments for some $29,000 in supplies ordered to complete construction of the marina and breakwater. He further testified that the transfer of title to him was necessary to obtain a further loan of $122,000 on the property, which he was attempting to negotiate with the First National Bank of Nevada.

Mr. Strecker admitted that he had authorized Sanguinetti to begin developing the property, but denied any definite agreement as to profit sharing or disposition of the property. He claimed to have assumed that any costs incurred would be satisfied out of the property. He further alleged that Sanguinetti represented that some of the engineering and legal services provided by others involved in the project were in return for past favors by Sanguinetti, and that Sanguinetti had resisted his attempts to clarify the financial arrangements between the parties.

After the transfer of title to Sanguinetti, the loan from South Lake Tahoe Savings and Loan was paid, and a new loan from First National Bank for $122,000 was obtained, secured by a

---

[1]The agreement, dated March 10, 1972, declared that First American Title Insurance Company held title to the property in question as agent for the Streckers and was to dispose of the property as directed in writing by Sanguinetti. The Streckers did not recall signing such an agreement, and Sanguinetti could give no explanation for the designation of First American, rather than First Stockton Title Company, other than that E. Sanguinetti, who signed the agreement on behalf of the title company, was an officer of both.

deed of trust on the property and Sanguinetti's personal note. Shortly thereafter, Sanguinetti moved into the restaurant, which was temporarily without a tenant, and began to devote his full attention to the project.

In late December 1972, the Streckers finally demanded an accounting. On January 1, 1973, a meeting was held at which the Streckers claimed they first learned of Sanguinetti's claim to the property. On January 3 the Streckers examined the county records and discovered the two deeds transferring title. The Streckers filed this action the following day, seeking cancellation of the deeds. On February 25, 1976, the Streckers filed an amended complaint seeking damages for, among other items, the amount of additional encumbrance occasioned by the loan from First National Bank, as well as loss of rent for the restaurant until the Streckers resumed possession in August 1973.

Sanguinetti has appealed from the judgment in favor of the Streckers and from the lower court's denial of his motion for a judgment notwithstanding the verdict or for a new trial.

2. *The Issues.*

Sanguinetti asserts numerous errors upon which he predicates his appeal.

A. *Substantial Evidence to Support the Finding of Fraud.*

Sanguinetti contends that the Streckers failed to meet their burden of proof on the claim of fraud. A charge of fraud must be supported by proof of the following elements in an action at law:

> A false representation made by the defendant, knowledge or belief on the part of the defendant that the representation is false—or, that he has not a sufficient basis of information to make it, an intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation, justifiable reliance upon the representation on the part of the plantiff in taking action or refraining from it, and damage to the plaintiff, resulting from such reliance. . . .

Lubbe v. Barba, 91 Nev. 596, 599, 540 P.2d 115, 117 (1975). Whether the claim of fraud is made in an action at law or in equity, the appellate court will not disturb the findings of the court or the jury where there is substantial evidence to support the claim. Close v. Flanary, 77 Nev. 87, 360 P.2d 259 (1961). In this case there is ample evidence to support the Streckers' claim, particularly in light of the relationship between the parties.

The Streckers claim that they signed a document represented to them by Sanguinetti as a deed of trust. Sanguinetti testified that the title was transferred "by prior arrangement . . . because we didn't know how we were going to hold title. . . . We knew that certain commitments had to be made, and I had made a lot of personal commitments, but what the final decision was going to be, whether we were going to, I think, form a partnership, or how we were going to do it at this point, was very uncertain. So, we put the property in the name of First Stockton Title for holding."

In light of the relationship between the parties, a finding of false representation by Sanguinetti is supported by reasonable inferences from the testimony of either the Streckers or Sanguinetti himself. Both the Streckers and Sanguinetti testified that they intended to become involved in a joint venture for the development of the property; only the nature or existence of an agreement as to compensation or disposition of the property are disputed. Sanguinetti was a close relative of Mrs. Strecker's. The Streckers had sought and obtained his advice and assistance in financial matters over a number of years. Under such circumstances, the Streckers were entitled to regard the relationship as one of trust and confidence. See Wilson v. Wilson, 23 Nev. 267, 45 P. 1009 (1896) (brothers); Schmidt v. Horton, 52 Nev. 302, 287 P. 274 (1930) (joint venturers); Stewart v. Phoenix Nat'l Bank, 64 P.2d 101 (Ariz. 1937), and Fipps v. Stidham, 50 P.2d 680 (Okla. 1935) (financial advisors). Under such circumstances, the Streckers were entitled not only to an accurate description of the instrument they were signing, but also to a full disclosure of Sanguinette's intentions, Dalton v. Dalton, 14 Nev. 419 (1880), and of their rights and the effect and consequences of their acts, Martin v. Dixon, 49 Nev. 161, 241 P. 213 (1925). Sanguinetti's own version of the events fully supports the conclusion that the Streckers were never informed of the effects and consequences of signing an unqualified grant deed to the title company. Furthermore, his description of his own concern at the time of the signing of the deed would support the inference that his unrevealed intention at that time was to take control of the property to protect his own interests.

Such evidence would also support the additional inferences that the misrepresentations or concealment of material facts and information involved were made with the knowledge and intention of Sanguinetti to induce the Streckers to sign the grant deed. His assurances to them that he would handle the details of title, permits, and loan arrangements, and his satisfactory handling of loan arrangements in the past, would

understandably lull the Streckers into a sense of security regarding the status of their title to the property and justify their reliance upon Sanguinetti's representations until the conversation of January 1973. *See* Davidson v. Streeter, 68 Nev. 427, 234 P.2d 793 (1951).

In short, the finder of fact was entitled to weigh the Streckers' contention that Sanguinetti obtained title to their property by fraud, against Sanguinettis contention that the Streckers intended to part with all legal claim to their property, retaining only "the financial protection that I was going to hold the property for their best interest", for the "consideration" of prospective financial gain, and to conclude that fraud was indeed the most plausible explanation.

B. *The Court's Refusal to Dismiss the Jury.*

Sanguinetti next contends that the issues were predominantly equitable, to which there was no right to a jury trial, and that, therefore, the court erred in refusing his motions to dismiss the jury. We do not agree.

Although the original posture of the Streckers' suit undoubtedly invoked the equitable jurisdiction of the court, legal issues also were raised by their claim for damages and by Sanguinetti's counterclaim upon the alleged oral agreement.[2]

In these circumstances it was permissible for the court to allow a jury to decide the legal issues, NRCP 38 and 39(b), and to reserve for court determination all equitable issues. This is precisely what occurred. The equitable claim for cancellation of the deed was not submitted to the jury, but was decided by the court after receiving the jury verdict on the legal issues.

C. *The Court's Refusal to Award Appellant Compensation for Benefits Conferred.*

Sanguinetti contends that the court erred in failing to require the Streckers, as a condition to the cancellation of the deeds, to compensate him for certain benefits conferred upon them. He identifies these benefits as payment of the note to South Lake Tahoe Savings and Loan, improvements to the breakwater and marina, obligations incurred to associates for legal and other services, and Sanguinetti's personal services in obtaining permits and overseeing the development.

The basic issue to be determined is whether the Streckers, by

---

[2]While Sanguinetti claims that his action on the alleged contract prayed only for specific performance, the relevant jury instruction, to which he did not object, explained that he claimed recovery of damages on the theory of breach of contract.

the award of the return of their property, plus $15,000 in compensatory damages awarded by the jury, were unjustly enriched. Restatement of Restitution, § 1 (1937). We conclude that in the circumstances of this case the court's decision to award the Streckers cancellation of the deed without requiring a setoff against the jury verdict met the fundamental requirement that equitable relief be granted on equitable terms. Robinson v. Kind, 25 Nev. 261, 62 P. 705 (1900).

·We first note that any restitution to which Sanguinetti may be entitled must be weighed against the damages to the Streckers' interests occasioned by his fraudulent conduct. The property as returned to the Streckers was encumbered by a deed of trust to the First National Bank of Nevada,[3] executed by Sanguinetti without the concurrence of the Streckers, upon which some $94,000 remained due at the time of the trial. The Streckers were also entitled to the rental value of the property during the period of Sanguinetti's possession. Heward v. Sutton, 75 Nev 452, 345 P.2d 772 (1959).

Sanguinetti first claims restitution under Morgali v. Kaupp, 70 Nev. 257, 265 P.2d 1069 (1954), in which this court held that a defrauded grantee was entitled to return of her property and to damages in the amount of a valid encumbrance on the property for which defendant was reponsible, but that a setoff against those damages was required in the amount of the consideration for the fraudulent transfer. The evidence in this case does not support the view that Sanguinetti's services or expenditures constituted consideration for the fraudulent transfer. They were rendered or made only after he had fraudulently acquired title to the property, and his own testimony was that the "consideration" for the transfer was only the prospect of financial gain. He is therefore not entitled to restitution on this ground.

Sanguinetti next claims restitution under *Robinson,* in which

---

[3]We note with some concern that First National Bank of Nevada was not joined as a party defendant to this action, although it was the beneficiary under the deed of trust. *See* Morris v. Hanssen, 78 S.W.2d 87 (Mo. 1934). We also note, however, that the jury was instructed, without objection, that should they find in favor of respondents, "the plaintiffs [respondents] shall be responsible for the balance of the obligation in the sum of [$]94,308.29 as secured by a deed of trust in favor of the First National Bank of Nevada." In view of what appears to have been the assumption of both parties, that the bank was without notice of the fraud and thereby acquired a valid deed of trust, the Streckers would appear to be estopped from asserting a contrary position against the bank's interest in the property. We therefore decline to exercise our prerogative under Johnson v. Johnson, 93 Nev. 655, 572 P.2d 925 (1977), to reverse or remand on this ground.

this court held that a remand was required by, among other things, the failure of the lower court to take into account the expenditures of a fraudulent grantee for taxes and a watchman's services in connection with the property.

The decision in *Robinson* reflects the general rule that even a fraudulent grantee is entitled to reimbursement of "necessary expenditures in preserving the property." Morris v. Hanssen, 78 S.W.2d 87, 95 (Mo. 1934). The bulk of the claims of Sanguinetti do not fall within this category. The Streckers, not he, paid the taxes on the property during the entire period in question. The personal services of Sanguinetti, as well as those of his associates (who submitted their bills to him only after this litigation had begun), were not offered to preserve the property but to pursue his grandiose scheme of development. On the other hand, his payment of the note to South Lake Tahoe Savings and Loan does fall within the rule, Blixt v. Janowiak, 188 N.W. 89 (Wis. 1922), and did relieve the Streckers' property of an encumbrance amounting to some $50,000. Against this, however, must be weighed the new encumbrance, for which the Streckers are obligated in the amount of some $94,000, as well as the loss of potential rent during the period of Sanguinetti's occupation of the property. In light of these detriments, the court below was not compelled to find that the $15,000 compensatory award unjustly enriched the Streckers.

Sanguinetti also suggests that the improvements to the property, apparently financed primarily by the loan from First National Bank of Nevada, must be thrown into the balance as well. This we decline to do. One who holds land under a fraudulent deed is entitled to restitution of the value of his improvements, or their cost, whichever is least, if he made them in the reasonable, good-faith belief that he held valid title to the land. Restatement of Restitution, § 42(1), at 167 (1937); Madrid v. Spears, 250 F.2d 51 (10th Cir. 1957). Sanguinetti's failure to secure all of the necessary permits, for which he had assumed responsibility, has cast the value of the improvements in grave doubt. Most important, his fraudulent conduct entirely deprives him of any claim of reasonable, good-faith mistake.

The record suggests that Sanguinetti has been disappointed in his expectation that he would be amply compensated out of the future profits from the land which he had fraudulently

acquired. In effect, he asks to be insulated from the risk of loss in his fraudulent scheme. This no court of equity is required to do.

D. *Other Contentions of Error.*

Sanguinetti's argument that the jury manifestly disregarded the proper instruction of the court by failing to award him damages, even in the face of a finding of fraud, on the basis of estoppel, is without merit. "The party who pleads an estoppel must be one who has, in good faith, been misled to his injury." Fipps v. Stidham, 50 P.2d 680, 684 (Okla. 1935). The Streckers' failure to prevent Sanguinetti from expending time and funds upon the project is traceable to his assurances to them, and his willingness to do so is clearly attributable to his own belief that his fraudulent acquisition of the title to their property would provide him more than adequate financial protection. He can claim neither to have acted in good faith nor to have been misled by any active conduct of the Streckers'.

In a related assignment of error, Sanguinetti contends that the case merits reversal because of the failure of the court to submit verdict forms to the jury permitting them to find both for the Streckers on their claim of fraud and for him on his counterclaim. This contention is also without merit. The jury was properly instructed on the matter and reached a verdict consistent with the relevant facts and applicable law. *Cf.* Thoma v. Gasper, 89 Nev. 170, 509 P.2d 967 (1973). Furthermore, the record does not affirmatively demonstrate that appellant raised such objections at trial. *See* Building Trades Council v. Thompson, 68 Nev. 384, 409, 234 P.2d 581, 591 (1951); Smith v. J.C. Penney Co., 525 P.2d 1299, 1304–1305 (Ore. 1974).

Sanguinetti also claims that the court erred in its instruction regarding punitive damages by failing to define the actual malice required as "an evil intention to do harm, on the part of the defendant." The argument that this constituted prejudicial error is without merit. There is no reason to believe that the jury understood that the malice it was to find was in any manner different from this definition. As noted by this court, legal malice is "a legal fiction; it is that form of malice which the law presumes. . . ." Nevada Credit Rating Bureau, Inc. v. Williams, 88 Nev. 601, 610, 503 P.2d 9, 14 (1972). Without an

instruction informing them of it, a jury would have no reason to know of its existence. The record, moreover, amply supports a finding of oppression and fraud sufficient to sustain the award of punitive damages.

Finally, Sanguinetti contends that the trial court erred in refusing to grant his motion for a judgment notwithstanding the verdict or a new trial on the issues of damages. Judgment notwithstanding the verdict is proper only when there is no substantial evidence to support the verdict, after all favorable inferences for the party in whose favor the verdict has been given are drawn. Dudley v. Prima, 84 Nev. 549, 445 P.2d 31 (1968). In making its award of damages, the jury was informed by a stipulated instruction of the exact amount of encumbrance remaining on the property by virtue of the First National Bank loan. The jury was, furthermore, instructed, without objection, that a finding of fraud on the part of Sanguinetti would constitute a defense by the Streckers against his legal claims, unless the jury found estoppel. There was also testimony that the rental value of the property during the period of Sanguinetti's occupation was $800 per month. There was, therefore, ample testimony in the record for the jury's award of $15,000 compensatory damages.

Remaining assignments of error have been reviewed and found meritless.

In conclusion, we hold that the judgment of the trial court was correct in all respects, and we therefore affirm.

BATJER, C. J., and THOMPSON and GUNDERSON, JJ., and HOYT, D. J.,[4] concur.

---

[4]The Governor designated Hon. Merlyn H. Hoyt, Judge of the Seventh Judicial District, to sit in place of HON. NOEL E. MANOUKIAN, Justice, who voluntarily disqualified himself in this case. Nev. Const. art. 6 § 4.